## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN VITA,<br><br>For herself and the Class,<br><br>v.<br><br>NEW ENGLAND BAPTIST HOSPITAL,<br><br>Defendant. | **Case No. 1:25-cv-11388-JEK**<br><br>**Jury Trial Demanded**<br><br>**Leave to file granted on**<br>**November 4, 2025 (Doc. No. 32)** |

### SECOND AMENDED COMPLAINT

Plaintiff Kathleen Vita ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

### Preliminary Statement

1.      Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendant, New England Baptist Hospital ("New England Baptist"), including but not limited to those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information").

2.      Specifically, New England Baptist intercepted communications between Plaintiff and other Class Members (defined below) and New England Baptist through a website maintained by New England Baptist (the "New England Baptist Website"). New England Baptist enabled Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called "tracking technologies" to secretly eavesdrop on healthcare consumers' communications with New England Baptist by injecting hidden code on the New England Baptist Website. Those third parties, including Google and Facebook, then associated the intercepted

communications with the real-world identities of individuals known to Google and Facebook. New England Baptist then used the contents of the intercepted communication for marketing purposes, such as serving personalized advertisements, including advertisements on Google and Facebook's advertising platforms, to healthcare consumers based on the contents of the secretly intercepted communications.

3.      New England Baptist intercepted the contents of patient communications on the New England Baptist Website to disclose those communications to Google, Facebook, and other companies so that those third parties and New England Baptist could then use the contents of the intercepted communications to advance New England Baptist's marketing efforts. The tracking technologies advanced New England Baptist's marketing efforts by enabling New England Baptist to use Google and Facebook's advertising platforms to target the patients whose communications were intercepted with advertising and to optimize the New England Baptist Website to market New England Baptist more effectively to customers (i.e., patients). That is, New England Baptist had an incentive, which it acted on, to disclose sensitive PHI to Google and Facebook to advance New England Baptist's own marketing efforts.

4.      As shown herein, New England Baptist intercepted communications for the primary purpose of committing criminal and tortious acts, including acts that violate the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), and Massachusetts statutory and common law torts described below. In particular, HIPAA prohibits the (i) disclosure or (ii) use of PHI without informed consent, including, specifically, the use of PHI for marketing purposes. As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.*, ¶¶ 32, 33, 38-48, 51-58, 72-73, 78, 85-86, 92, 98, 100, 102, 103, 105-107, 112-116, 118-119, 122-123, 145-149, 164), New England Baptist intercepted patient communications for the primary purpose of (i) disclosing the contents of those

2

communications to third-party marketing companies; and (ii) subsequently using the intercepted communications to advance New England Baptist's marketing of its services to patients, both of which are acts that violate HIPAA and Massachusetts tort law.

5.      By intercepting its patients' communications for the primary purpose of disclosing individuals' PHI to third parties for commercial gain, including later using the contents of the intercepted communication for New England Baptist's targeting of advertisements to those patients through Google and Facebook's advertising platforms, New England Baptist put its business interests over the privacy of its patients.

6.      The Plaintiff's and Class Members' communications with New England Baptist were secretly and contemporaneously intercepted, recorded, and transmitted to third parties, and New England Baptist subsequently used the intercepted communications for marketing purposes, without the consumers' knowledge or consent. The intercepted communications included, among other things, requests for information on particular conditions and treatments, keyword searches, doctor searches, bill payments, medical records, and access to the website's patient portal.

7.      Those interceptions enabled the third parties, including Google and Facebook, to know that a specific patient was seeking confidential medical care from New England Baptist. Recipients, such as Google and Facebook, subsequently sell Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies. New England Baptist also used Facebook's and Google's advertising platforms, which enabled New England Baptist to target advertisements to patients based on the patient communications that New England Baptist intercepted and disclosed to Google and Facebook.

8.      New England Baptist did not disclose to the Plaintiff and Class Members consumers that it intercepted and disclosed to third parties, such as Google and Facebook, the contents of

individuals' communications with New England Baptist or that those third parties and New England Baptist used the content of the intercepted communications for marketing, including targeted advertising. New England Baptist also did not seek or obtain patients' consent for such interceptions, the disclosure of the intercepted communications, or the subsequent use of the intercepted communications for marketing. On the contrary, New England Baptist **falsely** told healthcare consumers, through its published online privacy policy, that it does **not** share such information.

9.    Moreover, New England Baptist knew of the privacy implications of deploying the tracking technologies throughout its website, including on pages like the patient portal and bill payment pages, the use of which reflected patient status. As detailed below, the functionality of the tracking technologies was well-known to businesses that deployed them, and Google and Facebook expressly directed New England Baptist to obtain user consent for all tracking technologies and not to use tracking technologies on healthcare webpages. Notwithstanding this knowledge, New England Baptist deployed the tracking technologies anyway, including on pages specifically designed for patients (including its patient portal), without obtaining user consent. Indeed, New England Baptist deployed the tracking technologies for that very purpose: to disclose a patient's status as a New England Baptist patient, and that patient's communications on its website, so that New England Baptist and others could target those patients with advertising on Google and Facebook's advertising platforms.

10.    New England Baptist owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, New England Baptist assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

11.    As described more fully below, Plaintiff and Class Members have suffered injury as a result of New England Baptist's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their communications and Private Information.

12.    In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. On October 31, 2023, the Massachusetts Superior Court denied New England Baptist's motion to dismiss, rejecting New England Baptist's arguments that (i) the Massachusetts Wiretap Act should be limited to human-to-human conversation; (ii) the interceptions were not secret; and (iii) the interceptions were made in the ordinary course of New England Baptist's business. (Several other judges had likewise denied motions to dismiss in similar Massachusetts Wiretap Act cases against Massachusetts hospitals.) The Superior Court, however, reported its decision denying the motion to dismiss for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of the case. On October 24, 2024, the Supreme Judicial Court, in a split decision, reversed the Superior Court's order denying the motion to dismiss, holding that the Massachusetts Wiretap Act was ambiguous as to whether it encompassed the type of electronic website communications Plaintiff described in her original complaint. *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to

unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

13.     The Supreme Judicial Court, although reversing the Superior Court, did not direct that judgment be entered, recognizing, at least implicitly, that Plaintiff might amend her complaint to assert other claims the Supreme Judicial Court indicated were potentially cognizable based on the facts Plaintiff had alleged. In light of the Supreme Judicial Court's decision, Plaintiff previously amended her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, and several claims under common law.

14.     The ECPA prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. As detailed in this complaint, New England Baptist intercepted the electronic communications for the primary purpose of committing criminal and tortious acts, including the unauthorized disclosure and subsequent use of patient communications and Private Information in violation of HIPAA and in violation of Massachusetts law, as described below. In committing such criminal and tortious acts, New England Baptist was motivated to use health information protected by HIPAA and Massachusetts law to serve its own financial self-interest in maximizing the effectiveness of its online marketing. The ECPA thus provides a private remedy for New England Baptist's interception of electronic communications, enforceable against New England Baptist.

15.     Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the New England Baptist Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and

common law claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

## PARTIES

16.     Plaintiff is a resident of Revere, Massachusetts. Plaintiff is a patient of New England Baptist. Plaintiff regularly used the New England Baptist Website during the Class Period to obtain information about particular New England Baptist doctors (including their credentials and backgrounds); search for information on particular medical procedures; and access information about her medical care through New England Baptist's patient portal.

17.     As described below, New England Baptist implemented tracking technologies that intercepted communications between New England Baptist and healthcare consumers throughout the New England Baptist website. During the Class Period, Plaintiff visited specific pages on the New England Baptist on which New England Baptist embedded code for various tracking technologies, including Meta Pixel and Google Analytics. The pages Plaintiff visited included

(i)     the New England Baptist patient portal (*see* ¶¶ 108-116 for an explanation of how New England Baptist deployed tracking technologies that intercepted communications on its patient portal, the content of her communications that were intercepted, and how the intercepted communications were disclosed to and subsequently used for marketing by New England Baptist, Google, and Facebook);

(ii)     New England Baptist's searchable database of doctors and pages for particular doctors (*see* ¶¶ 104-107 for an explanation of how New England Baptist deployed tracking technologies that intercepted communications on its pages relating to doctors, the content of her communications that were intercepted, and how the intercepted communications were disclosed to and subsequently used for marketing by New England Baptist, Google, and Facebook); and

(iii)      pages about specific medical procedures (*see* ¶¶ 96-100 for an explanation of how New England Baptist deployed tracking technologies that intercepted communications on such pages, the content of her communications that were intercepted, and how the intercepted communications were disclosed to and subsequently used for marketing by New England Baptist, Google, and Facebook).

18.      Plaintiff has Google, Facebook, and Instagram accounts, which, as described below, enabled New England Baptist, Google, and Facebook to more easily connect Plaintiff's communications intercepted through the tracking technologies described in this complaint with Plaintiff's real-world identity to facilitate New England Baptist, Google, and Facebook to target advertising directed to Plaintiff based on the content of her intercepted communications.

19.      Plaintiff was unaware of and did not consent to or authorize the disclosure or use by third parties of her website communications or Private Information.  She was also unaware of and did not consent to the use of her website communications or Private Information by New England Baptist for marketing purposes.

20.      Defendant New England Baptist Hospital is a corporation that operates in Boston, Massachusetts. Its functions include providing healthcare services, including at its main campus in Boston, Massachusetts. New England Baptist maintains and controls the content of the New England Baptist Website.

## JURISDICTION

21.      New England Baptist has invoked this Court's jurisdiction and asserted the existence of subject matter jurisdiction through its Notice of Removal, Doc. No. 1, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446 (i.e., federal question jurisdiction)

## FACTUAL ALLEGATIONS

### New England Baptist and Its Website

22.     New England Baptist operates a hospital in Boston, Massachusetts, and several other locations, including Brookline, Chestnut Hill, and Dedham. New England Baptist offers inpatient and outpatient surgical care to residents in Boston and surrounding communities. New England Baptist is a specialist hospital focusing on orthopedic care and complex orthopedic procedures.

23.     New England Baptist maintains the New England Baptist Website for its hospital and outpatient facilities, found at https://www.nebh.org/. Through that website, healthcare consumers can obtain information about the services New England Baptist provides, including information about doctors, services, and procedures provided by New England Baptist for particular medical conditions.

24.     The New England Baptist Website is designed for communication with healthcare consumers. The website includes the following functions:

(a)     The New England Baptist Website provides general information about New England Baptist.

(b)     The New England Baptist Website provides information about healthcare services provided at New England Baptist, communicated through service-specific pages for a range of services such as "Foot & Ankle Care," "Pain Management," "Radiology," and "Sports Medicine," among many others.

(c)     The New England Baptist Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by services, specialty, and location.

(d)     The New England Baptist Website permits healthcare consumers to access and pay bills online.

(e)     The New England Baptist Website lets healthcare consumers access their private medical information online through Patient Portals.

25.     Certain pages of the New England Baptist Website were designed specifically for patients. These pages included the entire New England Baptist patient portal, a page for New England Baptist patients to obtain financial assistance, pages enabling patients to request medical records, and pages permitting patients to search for and contact particular New England Baptist physicians.

26.     Because the New England Baptist Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical services, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

### Reasonable Expectations of Users of the New England Baptist Website

27.     Healthcare consumers have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the New England Baptist Website.

28.     Users of healthcare-related websites such as the New England Baptist Website have a legitimate expectation and understanding that their communications with healthcare providers made through websites will be private. They also have a legitimate expectation that healthcare providers such as New England Baptist will not share with third parties their communications with New England Baptist without their consent.

29.     The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as New England Baptist from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as New England Baptist from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

30.     Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including New England Baptist, which reveal information about that individual's

status as a New England Baptist patient and personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

31.    The expectations and understanding of users of the New England Baptist Website are informed by what New England Baptist tells them about how it handles their personal information.

32.    The New England Baptist Privacy Statement states:

> New England Baptist Hospital (NEBH) is committed to protecting your privacy. **The NEBH website allows you to visit most areas without identifying yourself or providing personal information**. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy.

(emphasis added). This is false. As explained in greater detail below, New England Baptist injected hidden code into its website that intercepted and permitted third parties such as Google and Facebook to contemporaneously and surreptitiously eavesdrop on healthcare consumers' communications with New England Baptist. That hidden code tracks the user's IP address (i.e., the user's unique identity on the internet), connects the IP address to the user's browsing activity, and shares that same information with third parties such as Google and Facebook. Those third parties can then connect the user's intercepted communications with their real-world identities. It is, therefore, false to state that the "website allows you to visit most areas without identifying yourself," as Google and Facebook can and do identify users on the website and associate their identities with the website users' communications with the website. Google and Facebook can then use the communications to serve personalized advertising to those individuals, and New England Baptist can and did use the intercepted communications for marketing purposes, including targeted advertising on Google and Facebook's advertising platforms.

33.    The same Privacy Policy also states:

> New England Baptist Hospital routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. **The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data**. This data helps

us improve site content and overall usage. **This information is not shared with other organizations.** Except for authorized law enforcement investigations or other facially valid legal processes, **we will not share any information we receive with any outside parties.**

(emphasis added) The highlighted segments above are entirely false. As explained in greater detail below, communications are **not** collected only on an aggregate basis. Instead, the communications are recorded, intercepted, and collected on an individual basis. And, those communications are **not** collected on an anonymous basis. Instead, Google and Facebook can and do associate website users' communications with New England Baptist with particular individuals known to Google and Facebook (many by name), which information Google, Facebook, and New England Baptist can then use to serve personalized advertisements (including advertisements for New England Baptist) upon particular individuals. Finally, when New England Baptist says, "[t]his information is not shared with other organizations," this too is false. As discussed below, the communications throughout the Class Period to the present have been shared with Google and various other third parties, and before New England Baptist removed Meta Pixel, website users' communications with New England Baptist were shared with Facebook.

34.    Although the New England Baptist Website includes a pop-up on its website that references the use of "cookies and other tools to enhance your experience on the website," the pop-up links to the Privacy Statement discussed in the paragraphs above, which, as noted, presents false information that fails to disclose that New England Baptist assists third parties such as Google and Facebook to secretly and contemporaneously eavesdrop on website users' communications with New England Baptist.

35.    In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties or used for marketing purposes, including to inform targeted advertising, without their consent—an understanding reinforced strongly by New England Baptist's false and deceptive statements on the New England Baptist Website. The

interceptions of website users' communications with New England Baptist and the subsequent use of the intercepted communications for marketing purposes were, therefore, truly secret and made without any consent from Plaintiff or the other class members.

### Third Parties Offering Tracking Technologies

36.     Plaintiff describes in this complaint various tracking technologies implemented on the New England Baptist Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with New England Baptist. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with New England Baptist and the purposes for which interceptions are made.

37.     Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

38.     Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers. Facebook is a "real identity" platform. This means that users are permitted only one account and must use the name they go by in everyday life. To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.

39.     Facebook derives most of its revenue from selling targeted advertising directed to users of its platforms, including Facebook and Instagram. Facebook tailors advertising to particular individuals by building extensive behavioral profiles for each individual. These profiles are based not

---

[1] Facebook rebranded its parent company as "Meta" in October 2021.

only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

40.    Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

41.    Facebook states: "The Meta Pixel is a piece of code on your website that can help you better understand the effectiveness of your advertising and the actions people take on your site."[2] Among the key features of Metal Pixel, touted by Facebook, are[3]:

☞ **Key Features**

**Optimize the delivery of your ads.**
Ensure your ads reach the people most likely to take action.

**Measure cross-device conversions.**
Understand how your cross-device ads help influence online conversions.

**Create Custom Audiences from website visitors.**
Dynamic ads help you automatically show website visitors the products they viewed on your website—or related ones.

**Learn about your website traffic.**
Get rich insights about how people use your website from your Meta Pixel dashboard.

42.    Indeed, the express purpose of Meta Pixel is to track and disclose to Facebook a user's activities on a website, identify that individual user, and target that individual with advertising from the website owner (here, New England Baptist). For example, Facebook tells website owners to

---

[2] https://www.facebook.com/business/tools/meta-pixel.

[3] https://www.facebook.com/business/tools/meta-pixel.

"[i]nstall the Facebook pixel if you want to retarget your website visitors." Facebook explains that "[t]he Facebook pixel is a small snippet of code that you, your website engineer or a Facebook Business Partner can paste in your code. It tracks the people and the types of actions they take when they engage with your brand, including any of your Facebook ads they saw before going to your website, the pages of your site they visit and the items they add to their carts."

43.     Facebook receives and monetizes intercepted communications regardless of whether a website user has a Facebook account. Even for someone without an account with any Facebook platform (there are few such people; Facebook has over 2.9 billion users), Facebook still combines data it obtains through the Meta Pixel with other sources (including data obtained through data brokers) to identify the individual, and Facebook then sells the intercepted communications obtained through Meta Pixel, together with identifying information, to data brokers (i.e., companies that are in the business of collecting and compiling data on individuals from various sources then reselling that data to advertisers).

44.     Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

45.     Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[4]

46.     The primary reason businesses such as New England Baptist deploy Meta Pixel on their website is to maximize the effectiveness of the business's targeted advertising on Facebook's advertising platforms (including Facebook, Instagram, and other Facebook services). Facebook tells

---

[4] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

website owners like New England Baptist that they can use the Meta Pixel to "[o]ptimize delivery of your ad campaigns," and after the Meta Pixel is deployed, business owners can better "reach [their customers] through future Meta ads by retargeting those who have interacted with your website."[5]

47.    New England Baptist had advertised through Facebook's advertising platforms (this is, in fact, the reason why businesses use Meta Pixel—to advance their advertising efforts on Facebook's advertising platforms). New England Baptist has an incentive to share as much information as possible with Facebook through the tracking technologies, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of New England Baptist's advertising through Facebook platforms.

48.    Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through the Meta Pixel, Facebook directed New England Baptist to "provide[] robust and sufficiently prominent notice to users regarding [Meta Pixel]," including, a "clear and prominent notice on each web page where our pixels are used that links to a clear explanation…that third parties, including Meta, may…collect or receive information from your websites…and use that information to…target and deliver ads." Facebook also directs businesses not to use Meta Pixel on any webpage that "that includes health…information."[6] Despite these warnings that expressly put New England Baptist on notice about the operation of Meta Pixel and its implications for privacy, New England Baptist ignored the directions and warnings and deployed Meta Pixel without website users' consent on pages that contain health information.

49.    Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's

---

[5] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel.
[6] https://www.facebook.com/legal/terms/businesstools.

search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

50.     Google maintains detailed profiles of individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services, such as Gmail. Google maintains detailed profiles of individuals whether or not they have a Google account.

51.     Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

52.     One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics, a marketing tool Google offers to website owners. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the marketing of their business through the business's website. According to Google, Google Analytics is designed to "improve marketing ROI" and to "check the performance of [a business's] marketing." Google tells business owners like New England Baptist that Google Analytics "works with Google's advertising and published products, so that" business owners "can use [Google Analytics] insights to deliver business results."[7]

53.     Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google

---

[7] https://marketingplatform.google.com/about/analytics/.

can then use this information to serve such individuals with better-targeted individualized advertisements. Furthermore, after the interceptions, the website owner (here, New England Baptist) uses communications intercepted through Google Analytics to advance its own marketing objectives, including by using the insights provided by Google Analytics to inform its website marketing to potential or existing customers.

54.    Google also tells business owners like New England Baptist that after data is collected through Google Analytics, "in addition to using the data in [Google Analytics] reports, [business owners] can use the data in audiences for analyzing different groups of users and for exporting the data to advertising platforms like Google Ads so [the business] can run more data-driven advertisements."[8] By tying in Google Analytics with Google Ads, New England Baptist could "share [its] Analytics audiences with those products," thus advancing its targeted advertising efforts.[9] That is, Google Analytics data is used directly to facilitate "ads personalization," permitting New England Baptist to target advertising based on the intercepted communications.[10]

55.    New England Baptist used Google platforms to advertise, thus exploiting the information New England Baptist intercepted and disclosed to Google through Google's tracking technologies. In particular, during the Class Period, New England Baptist maintained an account with Google DoubleClick, an advertising division of Google, and when New England Baptist used Google Analytics, it associated the data connected through Google Analytics with its DoubleClick account, permitting Google to differentiate users from one another and to associate data with a unique user profile, which can then be used for targeted advertising.

---

[8]    https://support.google.com/analytics/answer/14430645?hl=en&sjid=5860316122186797017-NA&visit_id=638953584132868414-3109291497&ref_topic=12270146&rd=1.

[9]    https://support.google.com/analytics/topic/14277381?hl=en&ref_topic=9303474&sjid=58603161 2218697017-NA.

[10] [GA4] Advanced settings to allow for ads personalization - Analytics Help.

56.     New England Baptist had an incentive to share as much information as possible with Google, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of New England Baptist's advertising through Google platforms, including DoubleClick..

57.     Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through Google Analytics and DoubleClick, Google directed website owners like New England Baptist that they "must disclose [to users] the use of Google Analytics, and how it collects and processes data."  New England Baptist did not do so.

58.     In summary, New England Baptist configured Google Analytics to intercept the content of communications between the website user and any webpage on which Google Analytics code was injected. Google retained the communications intercepted through both Google Analytics, and Google can and does use those intercepted communications for its own commercial purposes, and New England Baptist also uses the intercepted communications when it uses Google's advertising platforms for its own marketing (that is in fact the primary purpose of the tracking technologies).

**Website Tracking Technologies on the New England Baptist Website**

59.     New England Baptist injected hidden code into the New England Baptist Website that intercepted healthcare consumers' communications with New England Baptist and disclosed them to third parties. Tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with New England Baptist with the website user's Facebook profile.

60.     New England Baptist uses or has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

61.     Before describing how such technologies work, it is important to first define some basic technological terms.

62.     A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

63.     An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the New England Baptist Website, as of the time of this complaint, is 146.20.186.124. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

64.     A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the New England Baptist Website is https://www.nebh.org/. Numerous URLs also point to specific pages on that website. Sometimes, the text contained in a URL will reveal information about the particular webpage itself or the substance of the information provided on it. Such URLs are called "descriptive" URLs. The New England Baptist Website was configured to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communications made through a particular page on New England Baptist's website. For example, the New England Baptist Website has a page specifically about New England Baptist's Pain Management practice; that page's URL is https://www.nebh.org/what-we-offer/pain-management/. That is, one can tell from the URL itself the substance of the communication between New England Baptist and the healthcare consumer—that the consumer is requesting information about pain management.

65.    A **"cookie"** is a file saved on a website user's device that helps track the user across different webpages or websites. Google Analytics and Meta Pixel are not themselves cookies but are instead, as described below, implemented by JavaScript code; they do, however, use cookies as one way to associate particular communications between website users and New England Baptist with individuals known to Google and Facebook. Because Google Analytics and Meta Pixel are not themselves "cookies," each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

66.    **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

67.    With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, New England Baptist) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

68.    The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from

Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

69.     When the JavaScript code causes the user's web browser to retrieve a file from the tracking technology vendor's website, the JavaScript code also causes the browser to communicate certain information to the vendor. That information includes, depending on the particular page visited, a combination of: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.nebh.org/what-we-offer/pain-management/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

70.     The JavaScript code first acquires the content of the communications made through a particular webpage, and then, subsequently, connects to the tracking technology vendor's servers (for example, Google or Facebook servers) to disclose the content of the intercepted communications to the tracking technology vendor. Although the acquisition/interception and disclosure occur through the same JavaScript program, they are distinct events activated by different parts of the code for each tracking technology. Although distinct, sequential events, the interception and disclosure to the third party occur contemporaneously with the website communications between Class Members and New England Baptist. The contents intercepted include private health information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

71.     When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google or Facebook can then add the content of the user's communications with New England Baptist to its collection of information it already has about the individual, which it can then use for advertising purposes.

72.     For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the intercepted communications with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them. New England Baptist can then use Facebook's advertising platform to target advertising to individuals who visited its website, based on the New England Baptist communications intercepted and transmitted to Facebook.

73.     The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectable only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

74.     The tracking technologies described in this complaint intercept and then transmit to third parties the contents of communications between healthcare consumers and New England Baptist contemporaneously with those communications. The tracking technologies intercept and

transmit the contents of those communications to third parties before the webpage has even completed loading.

75.    Google Analytics, Meta Pixel, and most other tracking technologies operate and continue to intercept communications even if a website user activates an "Incognito" or "Private Browsing" mode for a web browser and even if the website user adjusts his or her browser settings to restrict the use of cookies.

76.    The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[11] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites and patient portals, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[12] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or significantly limited its use.

77.    Due to how New England Baptist configured Meta Pixel, it is difficult to discern from archived versions of the New England Baptist Website the precise date New England Baptist removed Meta Pixel from its website. However, analysis of historical versions of the New England Baptist Website confirms that New England Baptist did use Meta Pixel during the Class Period but removed it at some point.

---

[11]  *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[12]  *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

**New England Baptist's Use of Tracking Technologies on the New England Baptist Website**

78.     New England Baptist has used various tracking technologies across the New England Baptist Website. New England Baptist injected several of those tracking technologies throughout the New England Baptist Website. For example, throughout the New England Baptist Website, New England Baptist injected hidden code that loads Google Analytics. It also previously injected hidden Meta Pixel code onto most pages on the New England Baptist Website. It also appears that New England Baptist removed Google Analytics on the New England Baptist Website long after the filing of the original complaint in this action, in or near May 2025. The examples provided below of New England Baptist's deployment of Google Analytics on the New England Baptist Website reflected such deployment around the time of the original complaint in this action. New England Baptist controls when and how it uses Google Analytics and other tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect New England Baptist's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint. New England Baptist deployed the tracking technologies on the specific webpages Plaintiff visited during the Class Period, as detailed below.

79.     The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

80.     Below is an image of the main landing page for the New England Baptist Website:



81.     When a user loads the main landing page for the New England Baptist Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" stands for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

82.     The image below depicts the landing page for the New England Baptist Website on the left-hand side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:



83.     A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:



84.    Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the New England Baptist Website are:

(a)    The URL of the webpage visited (the text after the letters "dl," which includes the text "www.nebh.org");

(b)    The title of the webpage (after the letters "dt," which includes "The Home – New England Baptist Hospital"); and

(c)    The page the website user visited immediately before visiting the New England Baptist Hospital Website (after the letters "dr," which includes "https://www.google.com").

85.    The other information transmitted to Google includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, New England Baptist).

86.    Notably, when the hidden code for tracking technologies intercepts the contents of communications between the website user and the New England Baptist Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with New England Baptist with the identity of particular individuals known to Google, Google uses that information for commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google on behalf of New England Baptist or any other businesses that use Google's advertising platforms (many do).

87.    Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." Browser fingerprinting works by using scripts (such as the tracking technologies here) to gather many software and hardware attributes from a user's device and browser, such as their operating system, screen resolution, resolution of their browser window, and other numeric codes that represent unique browser and computer settings. When combined, these data points create a distinct identifier—a

"fingerprint"—that uniquely identifies a user across different browsing sessions and websites, similar to a real-world fingerprint.

88.    Browser fingerprints allow tracking technology providers to track users across websites, and together with other data points such as IP address and unique user numbers, permit the tracking technology provider to know that a person browsing the New England Baptist Website is the same person the identity of whom is known to that provider (i.e., Google or Facebook)

89.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[13] Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

90.    New England Baptist also injected hidden Meta Pixel code on the same landing page for the New England Baptist Website during the Class Period. The hidden code New England Baptist injected into its website caused the user's browser to load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with New England Baptist. Below is an example of the contents of the communication between the website user and New England Baptist, which the hidden Meta Pixel code intercepted and transmitted to Facebook:

---

[13] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.



91.     Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and New England Baptist, including the URL of the webpage visited. The interception and transmission to Facebook also included information about the user's browser configuration and various codes to associate the communications with New England Baptist's advertising account with Facebook.

92.     Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook could then use the contents of communications between the website user and New England Baptist to serve personalized advertising to the website user in the future, and New England Baptist can use Facebook's advertising platforms to target advertising for New England Baptist to the individuals whose communications were intercepted.

93.     Moreover, the transmission to Facebook of the user's browser configuration permitted New England Baptist to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to

Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

94.    The text fields communicated to New England Baptist by the Meta Pixel code also include a persistent identifier for each user—a numeric code unique to a particular individual (similar to an account number). This permitted Facebook to track that individual across the New England Baptist Website and further confirm that individual's real-world identity.

95.    New England Baptist configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below serve to illustrate how the technologies work and include both webpages Plaintiff personally visited and other pages that other Class Members visited (some of the particular pages Plaintiff visited are identified in paragraphs 16-17 above). Plaintiff's communications with New England Baptist, including Private Information, were intercepted just like the examples set forth below.

96.    The New England Baptist Website contains numerous subpages describing "What we Offer." For example, the New England Baptist Website contains a page entitled "Pain Management," designed to inform the website user about the services New England Baptist offers "for patients with acute or chronic pain." By visiting this webpage, a user communicates that the user has some interest in pain management services. When the user communicates with New England Baptist by visiting this particular webpage, New England Baptist intercepts and transmits that communication to Google, Facebook, and other third parties. Below is a screenshot of the Pain Management webpage:



97.     The graphic below presents the contents of the communication between the website user and New England Baptist that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that New England Baptist secretly injects into the website (with highlighting added):



98.     As reflected in the above screenshot, the code injected into the New England Baptist Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting a "Pain Management" webpage on the New England Baptist Website— information that Google retains and uses for its own commercial purposes and that New England Baptist uses for its own marketing purposes.

99.     Before it removed Meta Pixel, New England Baptist inserted hidden code on the same webpage that intercepted the user's communication with New England Baptist and transmitted the same information to Facebook. New England Baptist secretly intercepted and transmitted to Facebook the contents of the communication between the website used and New England Baptist, including that the user is visiting a "Pain Management" webpage, information that Facebook retains and uses for commercial purposes. New England Baptist used Facebook's advertising platforms to target advertising for New England Baptist to the individuals who communicated with New England Baptist concerning that treatment (or any other specialty or treatment about which the user communicated with New England Baptist).

100.     The New England Baptist Website contains dozens of similar pages on particular medical specialties and practices that New England Baptist offers. For each such page, New England Baptist injected hidden code into its website that intercepted and disclosed to Google and Facebook the contents of communications with New England Baptist, similar to the above Pain Management example. Plaintiff visited during the Class Period pages similar to the Pain Management example above concerning specific medical treatments, and her communications were intercepted in the same manner as the above example. Google, Facebook and the New England Baptist then use the intercepted communications for commercial and marketing purposes, including for targeted advertising.

101.     The New England Baptist Website also includes a search function that permits individuals to search for medical or other information that is relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by New England Baptist. When an individual uses the search function, New England Baptist intercepts the contents of that search and transmits those contents to Google and other third parties. Below, for example, is the search results page for "knee pain."



102.    When a user performs this search on the New England Baptist Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's precise search terms and transmit them to Google. Below is the portion of the communication Google Analytics code intercepts and transmits to Google (with highlighting added):



As reflected in the above screenshot, New England Baptist, through the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google (as part of the URL and as part of the text "You searched for knee pain"), which Google and the New England Baptist use for their own commercial and marketing purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

103.    Upon information and belief, before it removed Meta Pixel, the same webpage contained hidden code that intercepted the user's communication with New England Baptist and transmitted the same information to Facebook, including the precise search terms a user entered on the New England Baptist Website—information that Facebook retains and uses for commercial purposes, and New England Baptist can use Facebook's advertising platforms to target advertising for New England Baptist to the individuals whose communications were intercepted.

104.    The New England Baptist Website also includes a "Find a Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as services, specialties, and location. Plaintiff used the "Find a Doctor" feature depicted below during the Class Period. By using the "Find a Doctor" function, the user communicates to New England Baptist that the user is a current or prospective patient. The screenshot below depicts the Find a Doctor page:



105.    Depicted below are the contents of the user's communication with the New England Baptist "Find a Doctor" webpage that New England Baptist intercepted and transmitted to Google via hidden Google Analytics Code (with highlighting added):



As reflected in the above screenshot, New England Baptist caused the hidden Google Analytics code to intercept and disclose to Google that the user is attempting to find a doctor at New England Baptist Hospital, information Google then uses for its own commercial purposes, including associating those

search terms with the individual's real-world identity for targeted advertising purposes. New England Baptist also uses the intercepted communications for its own marketing purposes.

106.    Prior to the removal of Meta Pixel from the New England Baptist Website, communications on the Find-a-Doctor webpage were likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the "Find a Doctor" communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Facebook and New England Baptist then use such intercepted communications for their commercial and marketing purposes, including targeted advertising to the individuals whose communications were intercepted.

107.    When a user submits a search on the Find-a-Doctor page, that communication between the user and New England Baptist is also intercepted and transmitted to Google via hidden Google Analytics code. The screenshot below depicts the contents of the communication between the website user and New England Baptist that are secretly intercepted and sent to Google via hidden Google Analytics code, including that the user has made a "form…submission" on the "Find a Doctor" page of "New England Baptist Hospital," information that Google and New England Baptist subsequently use for their own commercial and marketing purposes:



108.    The New England Baptist Website also contains purportedly secure "patient portals." The New England Baptist Website contains portals for hospitalized patients and separate portals for various doctors at New England Baptist. During the Class Period, the New England Baptist patient portals permitted patients to obtain access to their individual medical information. The portals included several publicly accessible pages on the New England Baptist Website used to navigate to and log into the patient portals, as well as dynamically generated pages accessed after a user logs into the patient portals (including pages regarding a patient's medical information, which, of course, are dynamically generated and unique to the patient).

109.    Prior to discovery, Plaintiff cannot know with certainty whether and to what extent New England Baptist during any portion of the Class Period used tracking technologies within the dynamically generated pages accessed after a patient logs into the patient portals, although many hospitals did so prior to the publicity and public outrage during the summer of 2022 regarding hospitals using tracking technologies on their websites and patient portals. New England Baptist did, however, deploy tracking technologies on pages used to navigate to and access its patient portal. By accessing those pages, a website user signals that the user is a patient of New England Baptist, and by deploying tracking technologies on those pages, New England Baptist intercepted and disclosed to Google, Facebook, and other third parties the users' status as New England Baptist patients.

110.    The screenshot below depicts the New England Baptist Website page that provides access to purportedly secure patient portals:



111.    In addition to the link for the portal "[f]or patients who have been hospitalized" depicted in the above webpage, there are additional portals for a particular doctor that a user can access by scrolling down further on the same webpage. That portion of the webpage is shown below:



112.    When a user visits the webpage depicted above, which communicates that the user is a patient of New England Baptist, that communication is intercepted and transmitted to Google via hidden Google Analytics code that New England Baptist has injected into the webpage. The contents of the user's communications intercepted and transmitted to Google are depicted below (with highlighting added). Google and New England Baptist then use such intercepted communications for commercial and marketing purposes, including targeted advertising:



113.    Prior to the removal of Meta Pixel from the New England Baptist Website, communications on the Patient Portals webpage were likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the patient portal communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Facebook and New England Baptist then use such intercepted

communications for commercial and marketing purposes, including targeted advertising to the individuals whose communications were intercepted.

114.    When a user clicks on the links to any of the patient portals, further signaling that the user is a patient of New England Baptist, that communication with New England Baptist is intercepted and transmitted to Google via hidden Google Analytics code. For example, when a user clicks on the link: "For patients who have been hospitalized: Access the New England Baptist Hospital Portal," that communication is intercepted and transmitted to Google, as depicted in the screenshot below (with highlighting added):



That is, the communication that a user has clicked on a link to "Access the New England Baptist Hospital Portal" is intercepted and transmitted to Google. Google and New England Baptist then use such intercepted communication for commercial purposes, including serving targeted advertising upon that individual.

115.   Similarly, if a user clicks on the patient portal for a particular doctor, that communication, including the identity of the doctor who treats the website user, is intercepted by

hidden Google Analytics code New England Baptist injected into its website and transmitted to Google. The contents of that intercepted communication are depicted in the screenshot below (with highlighting added):



That is, the communication through which the user accessed the patient portal for New England Baptist doctor Andrew Jawa, MD, is intercepted and transmitted to Google. Google and New England Baptist then use such intercepted communications for commercial and marketing purposes, including targeting advertising at that individual.

116.    Plaintiff regularly used the New England Baptist patient portal during the Class Period. Accordingly, her communications on the portal were intercepted and transmitted to third parties.

Those third parties retained her intercepted communications, and those third parties and New England Baptist used them for commercial and marketing purposes, including associating Plaintiff's communications with the individual's real-world identity for targeted advertising purposes (in combination with the other interceptions of Plaintiff's communications described above, including interceptions regarding specific conditions and doctors).

117.    The New England Baptist Website also contains a section permitting patients to pay bills they received from New England Baptist. The "Financial Resources" page of the New England Baptist Website, which contains the link to "visit our online payment portal," is depicted below:



118.    When a user clicks the "visit our online payment portal" link, the user communicates that the user is an individual who has received medical services from New England Baptist. That

communication with New England Baptist is intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication that are intercepted by and transmitted to Google are depicted below (with highlighting added):



As reflected in the above screenshot, hidden Google Analytics code intercepts that the user is visiting the "Financial Resources" page and has clicked on an "external link" to access the "online payment

portal" for New England Baptist. Google retains this intercepted communication, enabling Google and New England Baptist to use the content of the intercepted communication for commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

119.    Before Meta Pixel was removed from the New England Baptist Website, communications on the Financial Resources webpage were likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Facebook associated bill payment communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Facebook and New England Baptist then used such intercepted communications for marketing purposes, including targeted advertising to the individual based on the content of the intercepted communication.

120.    The New England Baptist Website also includes a webpage that provides information on obtaining patient medical records from New England Baptist. By visiting that webpage, a website user communicates that the user is a patient of New England Baptist. A screenshot of that webpage is shown below:



121.    When a user accesses that webpage, the user's communication with New England Baptist is intercepted by hidden Google Analytics code that New England Baptist has injected into the webpage. That code intercepts the contents of the user's communication with New England Baptist and transmits them to Google. The contents of the intercepted communication are depicted below (with highlighting added):



122.    That is, the communication that a user is seeking "Medical Records" from "New England Baptist Hospital" is intercepted and transmitted to Google. Google and New England then use the contents of such intercepted communication for commercial and marketing purposes, including targeted advertising to the individual based on the content of the intercepted communication.

123. Before the removal of Meta Pixel from the New England Baptist Website, communications on the Medical Records webpage were likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the medical records communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Facebook and New England Baptist then used such intercepted communications for commercial and marketing purposes, including targeted advertising to the individuals whose communications were intercepted.

### The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary

124. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the New England Baptist Website's operation. The New England Baptist Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

125. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to using Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with New England Baptist via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

126. Moreover, even if New England Baptist wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for New England Baptist (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that New England Baptist does not share the communications with others when it does; or (iii) to claim that New England Baptist maintains the privacy of those communications when it does not.

**New England Baptist Violated HIPAA and the FTC Act.**

127.    Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[14]

128.    Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

129.    HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

130.    The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[15]

---

[14] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[15] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

131.    Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

132.    The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

133.    The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

134.    "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

135. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[16]

136. The privacy rule also expressly provides that "a covered entity must obtain an authorization [from the patient] for any use or disclosure of protected health information for marketing…." 45 C.F.R. § 164.508(a)(3). That rule is directly implicated by tracking technologies in that the primary function of the tracking technologies is to permit both the tracking technology provider (for example, Google and Facebook) and the website owner (here, New England Baptist) to use the contents of the intercepted communications for marketing purposes after the interception occurs.

137. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[17]

138. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to

---

[16] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.15.
[17] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[18]

139.     In other words, the HHS has expressly stated that entities like New England Baptist that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-compliant authorization.

140.     The HHS Bulletin discusses the harms that disclosure may cause patients:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

141.     Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

---

[18] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

142.    As reflected in the current version of the HHS Bulletin posted on the HHS website, a district court decision vacated a portion of the HHS Bulletin. However, the remainder of the HHS Bulletin has neither been vacated nor withdrawn, including the portions to which Plaintiff refers above. In any event, Plaintiff is not suing for violation of the HHS Bulletin as such; instead, the HHS Bulletin reflects a reasonable interpretation of HIPAA and the Privacy Rule which is relevant for its persuasive force, including for the observation that the use of tracking technologies on healthcare provider website poses serious privacy implications and can lead to HIPAA violations, including on publicly accessible pages that disclose patient status.

143.    New England Baptist's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

144.    New England Baptist is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

145.    New England Baptist's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties, and those third parties and New England Baptist then use those intercepted communications for marketing purposes, all without their authorization.

146.    New England Baptist improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, and (c) patients' status as patients of New England Baptist by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, medical records access, bill payment pages, and the pages used to access patient portals).

147.    For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on doctors and medical procedures, New England Baptist permitted third parties to intercept the identity of doctors for Plaintiff, and specific treatments

connected to Plaintiff, each of which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

148.    New England Baptist improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. New England Baptist disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, and provider information.

149.    New England Baptist also improperly used patient communications and PHI for marketing purposes without patient authorization, including by using the intercepted communications for its own targeted advertising through third-party advertising platforms.

150.    New England Baptist violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

151.    New England Baptist further violated other HIPAA regulations as follows:

(a)    New England Baptist failed to ensure the confidentiality and integrity of electronic PHI that New England Baptist created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(b)    New England Baptist failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(c)    New England Baptist failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to New England Baptist in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(d)    New England Baptist failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(e)    New England Baptist failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(f)    New England Baptist failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

152.    Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[19]

153.    New England Baptist's undisclosed use of tracking technologies on its website violates Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of action, New England Baptist's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

154.    Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[20]

---

[19] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.
[20] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from

155. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

156. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

157. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[21]

158. In 2022, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty

---

FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

[21] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

for violating the Health Breach Notification Rule when its ovulation tracking app Premom shared

health data for advertising purposes.[22]

### New England Baptist Violated Industry Standards

159.    A medical provider's duty of confidentiality is embedded in the physician-patient and

hospital-patient relationship.

160.    The American Medical Association's ("AMA") Code of Medical Ethics creates rules

protecting the privacy of patient data and communications.

161.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

162.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

163.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

---

[22] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[23]

164.    New England Baptist, through the conduct described in this complaint, including the disclosure of patient communications to third-party technology and advertising companies and New England Baptist's own subsequent use of intercepted communications for marketing purposes, violated the AMA Code of Medical Ethics by gathering and recording information about patients that New England Baptist failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

**Plaintiff and Class Members Suffered Harm from New England Baptist's Unlawful Interceptions and Disclosures of Plaintiff's and Class Members' Private Information**

165.    An economic market exists for consumers' personal data, including the data that New England Baptist has collected and disclosed from Plaintiffs and Class Members.

166.    In 2013, the Financial Times reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."

167.    In 2015, TechCrunch reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name. That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.

---

[23] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

168.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price." This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.

169.    Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because it is not generally available to third-party data marketing companies due to the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists to sell and purchase such private medical information.

170.    Further, individuals can sell or monetize their own data if they choose. For example, Facebook has offered to pay individuals for their voice recordings and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smartphones.

171.    Many other companies and apps, such as DataCoup, Nielsen Computer, Killi, and UpVoice, also offer consumers money in exchange for access to their personal data.

172.    Given the monetary value that data companies like Facebook have already paid for personal information in the past, New England Baptist has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs' and the Class Members' property.

173.    As a direct and proximate cause of New England Baptist's unauthorized interceptions and disclosures of Plaintiff's and Class Members' communications and Private Information, and its

subsequent commercial exploitation of that information to support New England Baptist's marketing, Plaintiff and Class Members have been damaged by New England Baptist's conduct in the following ways:

(a)   Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b)   Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c)   New England Baptist denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used New England Baptist's services or would have demanded compensation for New England Baptist's use of their Private Information if they had known of New England Baptist's practices;

(d)   New England Baptist eroded the essential confidential nature of the provider-patient relationship;

(e)   General damages for invasion of Plaintiff's and Class Members' rights in an amount to be determined by a jury;

(f)   Nominal damages for each independent violation;

(g)   New England Baptist took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h)   New England Baptist's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i)   Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

## Class Action Allegations

174.   Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.nebh.org within three years prior to the date of the filing of the initial complaint in this action.

175.   This action is properly maintainable as a class action.

176. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

177. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and New England Baptist, through the New England Baptist Website, were electronic communications under the ECPA;

(b) Whether New England Baptist inserted tracking technologies into the hidden code of the New England Baptist Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the New England Baptist Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between New England Baptist and users of the New England Baptist Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, New England Baptist installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and New England Baptist;

(g) Whether and to what extent New England Baptist had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h) Whether New England Baptist had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(i) Whether the terms of New England Baptist's privacy policy either were or formed part of a contract between New England Baptist and Plaintiff and Class Members;

(j) Whether New England Baptist's disclosure of Plaintiff's and Class Members' IHII and PHI breached New England Baptist's promises set forth in its privacy policy, giving rise to liability for breach of contract;

(k)    If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of actions to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

178.    Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member communicated with New England Baptist by accessing the New England Baptist Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

179.    Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

180.    A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class Member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

181.    New England Baptist has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

### (Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)

182.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

183.    The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

184.    An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and New England Baptist, through the New England Baptist Website, were electronic communications under the ECPA.

185.    The tracking technologies inserted into the hidden code of the New England Baptist Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the New England Baptist Website; (ii) Class Members' web browsers used to access the New England Baptist Website; (iii) New England Baptist's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the New England Baptist Website.

186.    The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and then disclose to Google, Facebook, and other third parties the contents of communications between New England Baptist and users of the New England Baptist Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

187.    As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, New England Baptist configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and New England Baptist, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and New England

Baptist), permitting the interception of the substance of requests for information on particular doctors, permitting the interception of the substance of search terms inputted by healthcare consumers, and using tracking technologies on pages that would confirm to third parties such as Google and Facebook the healthcare consumers' likely status as New England Baptist patients, including pages through which patients access' New England Baptist's patient portals, obtain information about doctors, obtain medical records, and pay bills.

188.    With respect to Plaintiff, the tracking technologies revealed information regarding the doctors and treatments for Plaintiff by configuring the tracking technologies to reveal the substance of communications regarding Plaintiff's doctors and treatments, including Plaintiff's status as a patient of particular doctors.

189.    By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, New England Baptist intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

190.    Additionally, through the above-described tracking technologies, after New England Baptist intercepted communications, the intercepted information was subsequently used by New England Baptist and third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

191.    New England Baptist intercepted communications between the Class Members and New England Baptist, and New England Baptist disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception and the subsequent use of the intercepted communications for marketing purposes.

192.    The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

193.    As detailed in and supported by the factual allegations throughout this complaint ((*see, e.g.,* ¶¶ 32, 33, 38-48, 51-58, 72-73, 78, 85-86, 92, 98, 100, 102, 103, 105-107, 112-116, 118-119, 122-123, 145-149, 164), New England Baptist intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the primary purpose of committing criminal and tortious acts in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act.

194.    Before engaging in such criminal and tortious acts, as described above, Google and Facebook warned New England Baptist not to use tracking technology on webpages with health information without informed consent, which New England Baptist did not obtain. In committing such criminal and tortious acts, New England Baptist was motivated to use health information protected by HIPAA and Massachusetts law to serve its own financial self-interest in maximizing the effectiveness of its online marketing. New England Baptist's financial motivations demonstrate that its purpose was to commit a criminal or tortious act, as New England Baptist had an incentive, which it acted on, to disclose sensitive patient communications and Private Information to Google and Facebook and later to use the same intercepted communications for marketing purposes, in order to advance its own marketing on third-party advertising platforms.

195.    As alleged above, New England Baptist violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

196.    HIPAA defines IIHI as:

any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past,

present, or future physical or mental health or condition of an individual, the provision
of health care to an individual, or the past, present, or future payment for the provision
of health care to an individual, and (i) identifies the individual; or (ii) with respect to
which there is a reasonable basis to believe that the information can be used to identify
the individual.

42 U.S.C. § 1320d-(6).

197.    Plaintiff's Private Information that New England Baptist disclosed to third parties,
which both New England Baptist and the third parties later used for marketing purposes, qualifies as
IIHI, and New England Baptist violated Plaintiff's expectations of privacy and constitutes tortious
and/or criminal conduct by violating 42 U.S.C. § 1320d(6). New England Baptist used the intercepted
electronic communications to increase its revenues.

198.    The penalty for violating HIPAA is enhanced where "the offense is committed with
intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42
U.S.C. § 1320d-6. New England Baptist specifically used tracking technologies to intercept, disclose,
and later use for marketing purposes Plaintiff's and Class Members' Private Information.

199.    New England Baptist's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and
caused to be used identifiers associated with specific patients without patient authorization; and (ii)
disclosed IIHI to Facebook and other third parties without patient authorization.

200.    New England Baptist's conduct is subject to the enhanced provisions of 42 U.S.C. §
1320d-6 because New England Baptist's use of the Facebook source code was for New England
Baptist's commercial advantage to increase revenue from existing patients and gain new patients.

201.    The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose
wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the
ECPA.

202.    Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory
damages of $100 for each day of New England Baptist's violation of the ECPA for Plaintiff and each

Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

203.    The same acts that are criminal violations under HIPAA—including the disclosure and subsequent marketing use of PHI and private communications without consent—are likewise tortious acts under Massachusetts law, as detailed in the other counts of this complaint. Accordingly, New England Baptist additionally intercepted communications for the purpose of committing acts that are tortious under Massachusetts law (*see* ¶¶ 204-243, *infra*, which explains how the acts described in this complaint are tortious acts that give rise to liability, and how New England Baptist intercepted communications for the primary purpose of performing those acts that are tortious under Massachusetts law).

## COUNT II

### (Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of the Class)

204.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

205.    The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

206.    The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

207.    New England Baptist had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

208. Plaintiff and Class Members did not authorize New England Baptist to disclose their communications with New England Baptist to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment, nor did Plaintiff or Class Members authorize New England Baptist to later commercially exploit the improperly disclosed communications for marketing purposes, including targeted advertising to New England Baptist patients.

209. New England Baptist disclosed Plaintiff's and Class Members' private communications to unauthorized third parties in order to market its own services and increase profits, and those third parties can and did provide to or permit the use of the same information to numerous other third parties (including advertisers and data brokers). Therefore, New England Baptist's conduct reflected a public disclosure of private facts.

210. Additionally, New England Baptist's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Members' private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive because of both the disclosure of private communications and the later use of those communications for marketing purposes, including targeted advertising to the individual based on the content of the intercepted communication.

211. New England Baptist's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

212. Plaintiff and Class Members suffered injuries as a direct and proximate result of New England Baptist's disclosure of their communications, including Private Information, and New England Baptist intruded upon Plaintiff's and Class Members' seclusion.

213.    New England Baptist's acts or omissions violate the Massachusetts Right to Privacy Act.

214.    Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 139, *supra*), plus costs and attorneys' fees.

## COUNT III

### (Breach of Fiduciary Duty, on behalf of the Class)

215.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

216.    A fiduciary relationship existed between New England Baptist, a healthcare provider, and Plaintiff, a New England Baptist patient. Furthermore, New England Baptist assumed the role of a fiduciary by undertaking to collect the Private Information of Plaintiff and communications with Plaintiff made through the New England Baptist website.

217.    When possessing nonpublic medical information, medical providers such as New England Baptist have a duty to keep such information completely confidential.

218.    Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to New England Baptist through its website, which included highly sensitive Private Information and other private communications. New England Baptist's policies bolstered that expectation, given New England Baptist's promises to Plaintiff that New England Baptist would not disclose communications on the website to third parties.

219.    Contrary to its duties as a healthcare provider and its express promises of confidentiality, New England Baptist installed the tracking technologies to disclose and transmit to

third parties Plaintiff's and Class Members' Private Information and other private communications, including information relating to their healthcare.

220.    These disclosures were made without Plaintiff's knowledge, consent, or authorization.

221.    New England Baptist's secret and unauthorized disclosures of Plaintiff's Private Information and private communications, and the subsequent use of those communications for marketing purposes, constituted breaches of New England Baptist's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

222.    Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 139, *supra*).

## COUNT IV

### (Negligence, on behalf of the Class)

223.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

224.    Upon accepting, storing, and controlling the Private Information and communications of Plaintiff and the Class, New England Baptist owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information and private communications.

225.    New England Baptist breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information and private communications from unauthorized disclosure.

226.    It was reasonably foreseeable that New England Baptist's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information

through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

227. New England Baptist's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship between New England Baptist and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

228. In addition, New England Baptist's duty is informed by state law (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

229. New England Baptist's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information and communications; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

230. New England Baptist's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information and communications constituted negligence at common law.

231. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 139, *supra*), plus costs and attorneys' fees.

## COUNT V

### (Breach of Confidence, on behalf of the Class)

232.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

233.    Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

234.    Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

235.    When possessing nonpublic medical information, medical providers such as New England Baptist have a duty to keep such information completely confidential.

236.    Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to New England Baptist through its website, which included highly sensitive Private Information. New England Baptist's policies bolstered that expectation, given New England Baptist's promises to Plaintiff that New England Baptist would not disclose communications on the website to third parties.

237.    In light of the special relationship between New England Baptist and Plaintiff and Class Members, whereby New England Baptist became a guardian of Plaintiff's and Class Members' Private Information, New England Baptist became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third

parties; and (3) to maintain complete and accurate records of what patient information (and where) New England Baptist did and does store and disclose.

238.    Contrary to its duties as a medical provider and its express and implied promises of confidentiality, New England Baptist installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with New England Baptist and the contents of those communications, including but not limited to Private Information.

239.    New England Baptist made these disclosures for its own commercial purposes, including the later use of the disclosed information for New England Baptist's own marketing and targeted advertising on Google and Facebook's platforms, without Plaintiff's or Class Members' knowledge, consent, or authorization.

240.    The unauthorized disclosures and subsequent marketing use of Plaintiff's and Class Members' communications, including Private Information, were intentionally caused by New England Baptist's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' communications, including Private Information, occurred because of New England Baptist's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

241.    New England Baptist disclosed Plaintiff's and Class Members' communications, including Private Information, to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

242.    The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

243.    Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 139, *supra*), plus costs and attorneys' fees.

## COUNT VI

### (Breach of Contract, on behalf of the Class)

244.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

245.    New England Baptist required Plaintiff and Class Members to provide their personal information, including names, email addresses, phone numbers, computer IP addresses, and other content submitted to the New England Baptist Website as a condition of receiving healthcare services. Plaintiff's and Class Members' provision of such personal information provided consideration for New England Baptist's provision of services through the New England Baptist Website, including the provision of information and the use of the website to obtain medical services.

246.    In so doing, Plaintiff and Class Members entered into express contracts with New England Baptist (or, in the alternative, implied contracts) by which New England Baptist agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. New England Baptist's contractual promises included that (i) any data Plaintiff and Class Members provided through their communications on the New England Baptist Website would be collected only on an "aggregate, anonymous basis, which means no personally identifiable information [would be] associated with the data"; (ii) "[e]xcept for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with any outside parties"; and (iii) website server data would be used only to "prevent security breaches

and…ensure the integrity of the data on our servers," thus excluding from their contractual authority any ability to use information on website communications for third-party marketing purposes.

247.    Plaintiff and Class Members fully performed their obligations under the contract with New England Baptist.

248.    New England Baptist breached its agreement with Plaintiff and Class Members by directly breaching its promises to collect information only on an aggregate, anonymous basis, not to share information regarding website communications "with any outside parties," and to use information on website communications only to prevent security breaches and ensure data integrity.

249.    As a direct and proximate result of New England Baptist's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private Information and have been denied the benefit of the bargain of their agreement with New England Baptist.

250.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 139, *supra,* plus costs and attorneys' fees.


## COUNT VII

### (Unjust Enrichment, on behalf of the Class)

251.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

252.    This claim is pleaded in the alternative to Plaintiff's other causes of action.

253.    New England Baptist benefits from using the content of Plaintiff's and Class Members' communications with New England Baptist, including Private Information, and unjustly retained those benefits at Plaintiff's and Class Members' expense.

254.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

255.    New England Baptist consciously collected and used this information for its own gain, providing New England Baptist with economic, intangible, and other benefits, including substantial monetary compensation.

256.    New England Baptist unjustly retained those benefits at the expense of Plaintiff and Class Members because New England Baptist's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

257.    The benefits that New England Baptist derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for New England Baptist to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

258.    Had New England Baptist informed Plaintiff that it collected and shared Plaintiff's communications, including Private Information, with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of New England Baptist's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

259.    The Court should compel New England Baptist to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that New England Baptist unjustly received and such other relief as the Court may deem just and proper.

## **Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a.    Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23 and appointing Plaintiff as class representative and her attorneys as class counsel;

b.    Awarding damages (including statutory damages) to Plaintiff and Class Members;

c.    Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d.    Awarding such other and further relief which the Court finds just and proper.

## **Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 6, 2025                    Respectfully submitted,

                    */s/ Patrick J. Vallely*
                    SHAPIRO HABER & URMY LLP
                    Edward F. Haber (BBO #215620)
                    Michelle H. Blauner (BBO #549049)
                    Patrick J. Vallely (BBO #663866)
                    One Boston Place
                    Suite 2600
                    Boston, MA 02108
                    (617) 439-3939 – Telephone
                    (617) 439-0134 – Facsimile
                    ehaber@shulaw.com
                    mblauner@shulaw.com
                    pvallely@shulaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: November 6, 2025

*/s/ Patrick J. Vallely*
Patrick J. Vallely